**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KEON BRICE,** | : | **CIVIL ACTION NO. 1:03-CV-1979** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF YORK, OFFICER** | : | |
| **CAMACHO, OFFICER SCOTT** | : | |
| **NADZOM, OFFICER SHAFFER,** | : | |
| **OFFICER LOSTY, and OFFICER** | : | |
| **DEHART** | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

This is a civil rights suit brought under 42 U.S.C. § 1983 by plaintiff Keon

Brice ("Brice") against defendants City of York and five of its police officers.  Brice

alleges that the actions of the officers while arresting him violated his Fourth and

Fourteenth Amendment rights to be free from excessive force and state-created

danger.  Presently before the court is the defendants' motion for partial summary

judgment.  The motion seeks summary judgment on Brice's municipal liability

claims and on the state-created danger claim against the individual officers.  One of

the officers has also moved for summary judgment on the excessive force claim

based upon his participation in the arrest.  For the reasons that follow, the motion

will be granted with respect to all of these claims.

I.    **Statement of Facts**[1]

Brice's claims arise from the defendant officers' attempts to arrest him at the Vonni B. Grimes Gym in York, Pennsylvania.  He alleges liability against the city based on the conduct of the officers during that arrest.

A.    **Brice's Flight from Police and Subsequent Arrest**

Brice was playing basketball at the gym on the day of his arrest.  Police responded to the gym after an informant reported that Brice was there.  (Doc. 65 ¶ 20; Doc. 74 ¶ 20; Doc. 75, Ex. B, at 13.)  Brice had outstanding arrest warrants in Pennsylvania and New York, and the responding officers knew that he had a history of resisting and escaping prior arrest attempts.  (Doc. 65 ¶ 19; Doc. 74 ¶ 19; Doc. 75, Ex. B at 11-12; Doc. 75, Ex. S.)   Police formulated an arrest plan under which officers covered the gym's front and rear exits to prevent Brice from fleeing. (Doc. 65 ¶ 21; Doc. 74 ¶ 21; Doc. 75, Ex. B at 16-17.)  Defendant Officers Paul DeHart ("DeHart") and Andrew Shaffer ("Shaffer") entered the front of the gym accompanied by Sergeant Kahley and Officer Sowers, who are not defendants herein.  (Doc. 65 ¶ 21; Doc. 74 ¶ 21, Ex. B. at 16-17.)  The four officers planned to apprehend Brice while defendant Corporeal Craig Losty ("Losty") and defendant Officers Roland Camacho ("Camacho") and Scott Nadzom ("Nadzom") guarded the rear exit.  (Doc. 65 ¶ 21; Doc. 74 ¶ 21, Ex. B. at 16-17.)  Camacho covered the rear

_____

[1]In accordance with the standard of review for a motion for summary judgment, the court will present the facts in the light most favorable to the plaintiff, the nonmoving party.  See infra Part II.

door, his weapon drawn.  He testified that he drew his firearm because he believed
that intelligence from other officers indicated Brice "dealt with guns."  (Doc. 75, Ex.
B at 23-24.)  Wanted person materials published by the police department do not
corroborate this, but they state that Brice "fled/fought and escaped" prior arrest
attempts and advise that he "will fight and run."  (Doc. 75, Ex. S.)  Losty and
Nadzom held positions further from the door on either side of Camacho to
apprehend Brice should he attempt to evade arrest.  (Doc. 75, Ex. B at 17.)  While
they were waiting for the officers inside the gym to arrest Brice, another wanted
individual unrelated to the instant case exited the rear of the gym.  (Id. at 18.)  Losty
pursued him, leaving Camacho and Nadzom to cover the door.  (Id.)

     The four officers inside the gym approached Brice, who fled because he
"didn't know who they w[ere] there for."[2]  (Doc. 75, Ex. A at 43.)  The officers in the
gym radioed those outside, alerting them to Brice's retreat.  (Doc. 65 ¶ 23; Doc. 74 ¶
23.)  Camacho pointed his gun at the door, and when Brice exited the gym, he saw
Camacho ten feet away with the weapon directed at Brice's chest.  (Doc. 75, Ex. A at
43-45.)  Camacho made no attempt to stop Brice, who veered to the right and ran

---

[2]Brice testified that he fled because he was unsure whom the police were
seeking:

       Q.     Did you think that the officers were there for you?
       A.     I didn't know who they w[ere] there for. . . .
       Q.     If you didn't know who they were there for, why did you run?
       A.     Because they came running towards me, that's why I ran.

(Doc. 75, Ex. A at 43.)

away from Camacho.  (Id. at 51.)  Nadzom pursued Brice, overtook him, and tackled

him to the ground.  (Id. at 49-51; Doc. 67, Ex. E at 56.)  Brice struggled back to his

feet with Nadzom clinging to his shirt sleeve.  (Doc. 67, Ex. E at 56.)

   DeHart, Losty, and Shaffer caught up with the struggling pair.  (Id. at 57.)

DeHart grabbed Brice's arm while Shaffer forced his feet from underneath him.

(Id.)  Losty punched him in the head.  (Id.)  Camacho arrived after the other officers

and attempted to assist their arrest efforts.  (Id. at 58.)  Without holstering his

weapon, Camacho grabbed Brice in the collar area using the hand that held the

gun.  (Id.)  Camacho admitted that he should have holstered his weapon before

engaging Brice.  (Doc. 75, Ex. B at 33-34.)  The side of the weapon brushed against

Brice's temple as Camacho struggled with Brice.  (Doc. 67, Ex. E at 58-59.)  Brice

testified that he believed the contact between his temple and the side of the weapon

was accidental.[3]  (Id. at 60.)  The gun discharged alongside Brice's head only

"seconds" after Camacho arrived to assist the other officers.  (Id. at 59-60.)  Brice

---

[3]Brice testified as follows:

   Q.   As you sit here today[,] you don't know if it was accidental in the
        process of grabbing you with the gun out that it came in contact with
        your head?
   A.   I think it was accidental.

(Doc. 67, Ex. E at 59-60.)

4

stated that the gun "just went off."[4]  (Id. at 60.)  Fortunately, the bullet did not strike

Brice, the officers, or any passersby.  The officers then apprehended Brice, who

later lodged a citizen complaint against the officers alleging they used excessive

force to seize him.

### B.    The Police Department's Policies and Customs

Brice's claims arise from both the actions of the individual officers and the

policies and customs of the York City Police Department ("the police department"

or "the department"), which is operated by defendant City of York ("the city").  He

alleges the department's inadequate handling of citizen complaints and training of

officers proximately caused his injuries under the doctrines of excessive force and

state-created danger.

The department has implemented a formal policy for investigating citizen

complaints.  (Doc. 75, Ex. F.)  The policy requires citizen complaints to be

documented on a Citizen Complaint Report form.  (Id. § III.A.1 & .2.)  Supervising

officers document complaints on the report form and attempt to conciliate with

complainants.  (Id. § III.A.1.a.)  The complaint report form is forwarded to the police

---

[4]Brice testified as follows:

Q.    How soon after he grabs—he meaning Camacho—grabs the left neck
      area of your shirt, how long after that does the gun discharge?
A.    Seconds.
Q.    Okay.  I mean, is it just bang bang?
A.    He grabbed me, hit my face, and—ssshht—it just went off.

(Doc. 67, Ex. E at 60.)

department's Inspectional Services Division ("the division") regardless of the

outcome of that discussion. (Id. § III.A.5.) The division, also known as Internal

Affairs,[5] investigates any complaints not resolved by the intake officer. (Id. § III.C.)

Each form is identified by a sequential serial number, and the division must audit

the forms periodically to verify that all complaints have been resolved or are being

investigated. (Id. § III.A.5.) Complaints alleging police brutality are not

investigated unless the complaint is sworn under oath. (Id. § III.A.6.)

Less than one month before Brice's arrest, Inspector William Follmer

("Follmer") was appointed to head the Inspectional Services Division. (Doc. 75, Ex.

E at 5, 8.) Follmer indicated that in practice the complaint process failed to strictly

comply with formal policy at the time he took office. Follmer was never formally

trained on the seven-page citizen complaint policy by his predecessor, though he

reviewed it upon taking office. (Id. at 36-37.) He examined the department's stock

of blank citizen complaint forms and noticed that tablets containing approximately

three hundred serially numbered forms were missing. (Id. at 62.) Follmer testified

that the missing forms were never completed by complainants, and he stated that

he was confident that the missing forms did not represent unaddressed complaints.

(Id.)

---

[5] Inspector William Follmer, the division's sole staff member at the time of the events of the instant case, referred to the division as Internal Affairs. (See Doc. 75, Ex. E at 5.)

Complaint investigations involve the inspector contacting complainants who provided contact information on the complaint form.  (Doc. 75, Ex. G at 60.) Complainants who do not provide contact information are sent a registered letter requesting a response.  (Id.)  If the complainant remains incommunicado after the registered mailing, the inspector may, based on the available evidence and his or her discretion, choose to close the investigation or continue the inquiry.  (Id.)

Disciplinary action against officers arising from citizen complaints is permanently tracked in officers' personnel files.  (Doc. 75, Ex. F § III.G.) Complaints that yield no discipline are maintained in the division's offices for three years, after which they are destroyed.  (Id.)  During his tenure, Follmer maintained no disciplinary records independent of the information in the personnel files.  (Doc. 75, Ex. E at 69.)

Brice alleges that the police department's policy failed to detect an alleged pattern of excessive force by officers that could have corrected, thereby preventing his injury.  He also argues that the city failed to train its officers in the appropriate use of force, also contributing to his constitutional injury.

C.    **Procedural History**

After Brice filed a citizen complaint with the police department, he commenced the instant action.[6]  His complaint alleges that the conduct of the city and the officers violated his Fourth Amendment right to be free from excessive force and his Fourteenth Amendment right to be free from state-created danger. He maintains assault and battery claims under Pennsylvania law against the individual officers.[7]  All defendants move for summary judgment on Brice's state-created danger claim.  The city also moves for summary judgment on the excessive force claim.[8]

Defendants' motion does not formally request summary judgment on the excessive force claim against Camacho, (see Doc. 63), but the parties' briefs

_____

[6]Brice was committed to the New York State Department of Correctional Services after the filing of the complaint.  (See Doc. 79.)  His transportation from New York to Pennsylvania could not be arranged in a manner that would enable him to comply with the originally established trial schedule.  The case was stayed for the duration of his New York incarceration, a period of twelve months.  (See Docs. 78, 79, 84.)  Brice was then transferred to the custody of the Pennsylvania Department of Corrections.  The court lifted the stay because Brice is now able to appear for proceedings.  (Doc. 81, Ex. B; Doc. 84.)

[7]The claim for excessive force is not subject to the instant motion to the extent predicated upon the intentional conduct of the individual defendants.  The assault and battery claims, which Brice maintains exclusively against the individual defendants, are also excluded from this motion.

[8]Defendants also seek summary judgment on state law assault and battery claims asserted against the city.  (Doc. 64 at 18-20.)  To the extent that the complaint alleges such a claim, Brice has stipulated that he maintains it only against the individual defendants rather than against the city.  (Doc. 73 at 32 n.23.)  The court will therefore consider defendants' motion on the municipal liability claim for assault and battery no further.

nevertheless address it insofar as it arises from the firing of Camacho's sidearm.

The court will therefore construe the motion as requesting judgment on that claim

to the extent predicated upon the shooting.  The parties have fully briefed these

issues, which are ripe for decision.

## II.    <u>Standard of Review</u>

Through summary adjudication the court may dispose of those claims that do

not present a "genuine issue as to any material fact," and for which a jury trial

would be an empty and unnecessary formality.  <u>See</u> FED. R. CIV. P. 56(c).  It places

the burden on the non-moving party to come forth with "affirmative evidence,

beyond the allegations of the pleadings," in support of its right to relief.  <u>Pappas v.

City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); <u>see

also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  This evidence must be

adequate, as a matter of law, to sustain a judgment in favor of the non-moving party

on the claims.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-57 (1986);

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-89 (1986); <u>see

also</u> FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the cause of action

proceed.  <u>Pappas</u>, 331 F. Supp. 2d at 315.

## III.    <u>Discussion</u>

Camacho seeks summary judgment on the excessive force claim arising from

the firing of his weapon.  Camacho, along with DeHart, Losty, Nadzom, and Shaffer

move for summary judgment on the state-created danger claim, and the city

9

requests summary judgment on both the excessive force and state-created danger claims against it.

Brice maintains all claims subject to the instant motion pursuant to 42 U.S.C. § 1983.[9]  Section 1983 provides protection where official action causes a "deprivation of rights protected by the Constitution."  Monell v. Dep't of Soc. Svcs, 436 U.S. 658, 690 (1978).  However, § 1983 is not an independent source of substantive rights.  Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  Rather, "it provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." Kneipp, 95 F.3d at 1204; see also Collins v. City of Harker Heights, 503 U.S. 115, 119 (1992) (Section 1983 "does not provide a remedy for abuses that do not violate federal law.").  In order to establish a § 1983 claim, a plaintiff must demonstrate, first, the deprivation of a constitutional right, and, second, that a "person acting under the color of state law" is responsible for the alleged deprivation.  Kneipp, 95 F.3d at 1204 (internal citations omitted); Collins, 503 U.S. at 120.

---

[9]Section 1983 provides, in relevant part, that

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

###### A.      **Claims against the Individual Defendants**

Brice claims that Camacho violated his Fourth Amendment right to be free from excessive force when Camacho's weapon discharged during the course of Brice's arrest.  He also maintains a state-created danger claim arising under the Fourteenth Amendment against Camacho and the other individual defendants.

###### 1.      **Excessive Force Claim against Camacho**

Every citizen has a Fourth Amendment right to be free from excessive force during lawful arrests.  See Kopec v. Tate, 361 F.3d 772, 776-78 (3d Cir. 2004). "Violation of the Fourth Amendment requires an intentional acquisition of physical control" over the plaintiff.  Brower v. County of Inyo, 489 U.S. 593, 596 (1989).  An excessive force claim under the Fourth Amendment requires that the police act "*through means intentionally applied*" to secure physical control the plaintiff.  Id. at 597.  The acquiring of physical control, or seizure, need not occur in the manner originally intended by the police, but it *must* result from volitional police activity performed for the purpose of seizing the plaintiff.  Id. at 599 (holding that a seizure results whenever an individual is "stopped by the very instrumentality set in motion or put in place in order to achieve that result"); In re City of Phila. Litig., 158 F.3d 711, 722 (3d Cir. 1998) (stating that an excessive force claim requires police action demonstrating an objective intent to effectuate a seizure but that the seizure need not occur through the specific means intended to bring it about); In re City of Phila. Litig., 49 F.3d 945, 974 (3d Cir. 1995) (holding that the existence of a seizure is determined by whether an individual's movement is restricted by means

11

implemented with the intent to produce that result).  Negligent, accidental, or

unintentional conduct that has the coincidental effect of producing a seizure will

not substantiate an excessive force claim.  See Brower, 489 U.S. at 596 ("[T]he

Fourth Amendment addresses 'misuse of power,' . . . not the accidental effects of

otherwise lawful government conduct." (citation omitted)); McCracken v. Freed,

No. 06-1510, 2007 WL 1748689, at *4 (3d Cir. June 19, 2007) (same).  The

requirement of volitional action is no less integral to the excessive force claim of a

plaintiff already in police custody, and such a plaintiff must produce evidence of a

volitional act sufficient to bring about a "second seizure" of the plaintiff.  See

Troublefield v. City of Harrisburg, 789 F. Supp. 160, 166 (M.D. Pa. 1992) (stating that

accidental shooting of handcuffed suspect could not support an excessive force

claim but that an intentional shooting under similar circumstances would have

given rise to such a claim), aff'd 980 F.3d 724 (3d Cir. 1992) (mem.).

This court has previously addressed the volition necessary for an excessive

force claim.  In Troublefield v. City of Harrisburg, the court considered the

excessive force claim of a plaintiff accidentally shot by the officer arresting him.

See id. at 162.  The officer was on patrol alone and had drawn his sidearm during

the course of the arrest.  See id. at 161-62.  He handcuffed the plaintiff and was

returning the weapon to its holster when it accidently fired, shooting the plaintiff in

the leg.  See id. at 162.  The plaintiff argued that the accidental discharge of the

weapon warranted Fourth Amendment liability because the plaintiff was seized by

the application of handcuffs when the firearm discharged.  Id. at 166.  This  court

rejected the plaintiff's argument, holding: "[S]ome nature of volitional act on the part of the state actor must cause the harm to plaintiff for a fourth amendment excessive force claim to sound.  Negligence in pulling out a firearm or in reholstering it is not sufficient in this court's view" to hold a defendant liable for an excessive force violation.  Id.

Troublefield's holding relied upon Dodd v. City of Norwich, 827 F.2d 1, 7-8 (2d Cir. 1987), which reached a similar conclusion prior to Brower's mandate that excessive force requires a volitional act.  In Dodd, the defendant police officer drew his firearm while apprehending a burglary suspect.  See id. at 3.  The suspect was lying one the ground prone when the officer, still holding the weapon, began to handcuff him.  Id.  The suspect then resisted arrest and reached for the weapon.  Id. The officer instinctively pulled it away, and it accidentally fired, killing the suspect within a few minutes.  Id.  An expert report produced by the plaintiff suspect's administratrix opined that the police department's use-of-force procedure, which the officer's action followed, should have instructed officers to reholster their weapons before handcuffing a suspect.  Id. at 6.

After rehearing, the United States Court of Appeals for the Second Circuit held that the accidental shooting could not support an excessive force claim.  Id. at 7-8.  The shooting occurred as a result of the officer's accidental and negligent acts, which, unlike intentional conduct, were insufficient to support constitutional recovery.  Id. at 7 ("It makes little sense to apply a standard of reasonableness to an accident.")  It affirmed the district court's grant of summary judgment in favor of

the officer because the plaintiff's injury occurred entirely though the officer's

inadvertence.  Id. at 8.  During the years since Dodd and Troublefield, courts have

consistently held that plaintiffs cannot predicate excessive force claims on

accidental police shootings.[10]  See, e.g., Pollino v. City of Phila., No. Civ. A. 03-

---

[10]Brice has suggested that Johnson v. City of Milwaukee, 41 F. Supp. 2d 917
(E.D. Wis. 1999) reached a contrary conclusion.  Johnson involved an officer who
deliberately struck a suspect with his gun in order to gain physical control over the
plaintiff suspect.  See id at 922.  The weapon accidentally fired as the officer used it
to apprehend the plaintiff.  See id.  The court denied the defendant's motion for
summary judgment, relying on precedent of the United States Court of Appeals for
the Seventh Circuit, which holds that "once a seizure has occurred it continues
until the arrestee is in the company of the arresting officers."  Id. at 924 (citing
Lester v. City of Chi., 830 F.2d 706, 713 n.7 (7th Cir. 1987)).  The Johnson court
evaluated the totality of the officer's conduct when and applied the Fourth
Amendment despite the accidental nature of the shooting because the officer's
course of conduct in arresting the plaintiff effectuated a seizure of the plaintiff's
person.  See Johnson, 41 F. Supp. 2d at 924, 28.
        Johnson is factually distinguishable.  In contrast to the instant case, the
officer in Johnson deliberately used his weapon as a means to strike plaintiff with
the intent to apprehend him.  The officer did not intend to discharge a bullet, but
his use of the weapon was volitional.  The Johnson court observed that the officer's
volitional use of the weapon to seize the plaintiff may have been sufficient to invoke
the Fourth Amendment despite the accidental discharge of the weapon.  The court
noted:
        [E]ven if the question was whether the shooting constituted a seizure,
        . . . Johnson would have a strong argument under Brower that a
        seizure occurred.  In Brower, the court said that the intentionality
        requirement was met when a person was stopped "by the very
        instrumentality set in motion or put in place in order to achieve that
        result."  Brower, 489 U.S. at 599. . . . In the present case, the
        instrumentality set in motion to effectuate the seizure was [the
        officer's] gun.
Johnson, 41 F. Supp. 2d at 928 n.3.  The court then indicated that Fourth
Amendment recovery for the accidental discharge would be appropriate because
the gun was "set in motion" to achieve a seizure of the plaintiff.  Brower, 489 U.S. at
599.
        To the extent that Johnson reaches a result contrary to the holding in
Troublefield, the court will apply the law as interpreted by its holding in the latter

14

6288, 2005 WL 372105, at *7 (E.D. Pa. Feb. 15, 2005) (citing Dodd and Troublefield

while reiterating that accidental discharge of a firearm cannot support an excessive

force claim); Owl v. Robertson, 79 F. Supp. 2d 1104, 1114 (D. Neb. 2000) (relying on

Dodd to hold that "if [a] shooting [is] truly accidental, then there [is] no violation of

. . . Fourth Amendment rights"); Clark v. Buchko, 936 F. Supp. 212, 219-220 (D.N.J.

1996) (holding that Fourth Amendment claims for accidental shooting are

inappropriate if "the officer[] lacked intent to seize the victims by firing the

guns.").[11]

---

case. This outcome is appropriate in light of the Third Circuit's interpretation of
Brower, under which excessive force recovery requires the officers' action to
demonstrate "objective intent . . . to use force to effectuate a seizure." In re City of
Phila. Litig., 158 F.3d at 722. The court finds the accidental gunshot, see infra pp.
14-15, does not reveal an objective intent to seize Brice and cannot support recovery
under the Fourth Amendment.

[11]These and other analogous cases evaluate the viability of excessive force
claims by analyzing the volitional nature of the action upon which plaintiff alleges
injury. Reviewing courts have denied recovery for accidental gunshots resulting
both from confrontation between officers and a suspect and from officers' negligent
conduct.

For example, in Clark v. Buchko, 936 F. Supp. 212 (D.N.J. 1996), our sister
court for the District of New Jersey refused recovery for an accidental gunshot after
the suspect suddenly resisted arrest. The defendant officer and other officers were
arresting a suspect. Id. at 215. The defendant officer pointed his shotgun at the
suspect and instructed him to lie on the floor. Id. at 216. The suspect complied, and
the officer, gun still in hand, began to handcuff him. Id. Without warning, the
suspect jumped up and backed into the shotgun. Id. It discharged accidentally,
killing him. Id. The court denied recovery, stating: "[t]he simple fact of this case is
that [the decedent] was not intentionally shot. . . . As the Supreme Court explained
in Brower, no seizure occurs unless 'there is a governmental termination of
freedom of movement through means intentionally applied.'" Id. at 220 (quoting
Brower, 489 U.S. at 597).

Similarly, in Matthews v. City of Atlanta, 699 F. Supp. 1552 (N.D. Ga. 1988),
the defendant officer accidentally shot the suspect, whom he attempted to

An excessive force claim may proceed to substantive analysis only after the

excessive force plaintiff establishes a threshold volitional act.  The substantive

analysis then considers whether the officer's use of force was reasonable under the

---

apprehend for automobile theft.  The suspect was sitting in the vehicle when the
officer approached, his firearm drawn.  Id. at 1553.  The officer aimed the gun at the
suspect's head and instructed him to disengage the engine and exit the vehicle.  Id.
He failed to do so, and the officer reached into the passenger compartment to turn
off the engine.  Id.  As he did so, the truck lurched forward into defendant as he
held his gun.  Id.  The weapon accidentally discharged, killing the suspect.  Id. at
1554.  The court denied excessive force recovery because the non-volitional
shooting failed to effectuate a seizure of the plaintiff's decedent, placing the injury
beyond Fourth Amendment protection.  Id. at 1556.

Courts have also disallowed recovery in cases involving negligent conduct by
officers.  In Pollino v. City of Phila., No. Civ. A. 03-6288, 2005 WL 372105 (E.D. Pa.
Feb. 15, 2005), the defendant officer observed the plaintiff conducting a drug
transaction.  The officer approached the plaintiff from behind, with his weapon
drawn.  Id. at *2.  As the officer approached the plaintiff, he observed that plaintiff
was unarmed.  Id.  Nevertheless, he attempted to reholster his weapon and grab the
plaintiff simultaneously.  Id.  The gun accidentally discharged in the process.  Id.
The court granted summary judgment in favor of the officer, holding that the
accidental shooting was insufficient to constitute a seizure.  Id. at *8.

Glasco v. Ballard, 768 F. Supp. 176 (E.D. Va. 1991) presents a more egregious
instance of officer negligence.  The defendant officer responded to a convenience
store theft.  Id. at 177.  Having completed his evaluation of the crime scene, he was
driving along a nearby street when he spotted the plaintiff carrying two items in his
sweatshirt pocket.  Id.  The officer believed these items to be a twinkie and a can of
corned beef stolen from the convenience store.  Id.  The officer stopped his patrol
car and spoke with the plaintiff, whom he could not understand from inside the
vehicle.  Id.  He exited the vehicle, drawing his gun in the process.  Id.  The car
began to drift forward, and he reached an arm and a leg back inside the car to apply
the brake and shift the transmission.  Id.  His gun accidentally fired as he did so,
hitting the plaintiff.  Id.  The court characterized the shooting as "wholly
accidental" and therefore granted summary judgment in favor of the officer
because it was outside the protection of the Fourth Amendment.  Id. at 180.

These cases instruct that the desideratum of an excessive force claim is a
volitional act.  An accidental shooting by police fails to constitute a seizure as a
matter of law and is therefore not compensable under the Fourth Amendment.

circumstances of the arrest.  See Carswell v. Borough of Homestead, 381 F.3d 235,

240 (3d Cir. 2004).  Generally, the issue of reasonableness is a question of fact

reserved for the jury.  Summary judgment is appropriate only if the court "resolves

all factual disputes in favor of the plaintiff and concludes that the use of force was

objectively reasonable under the circumstances."  Gravely v. Speranza, 219 F.

App'x 213, 215 (3d Cir. 2007).

In the case *sub judice*, Brice's excessive force claim arises from police action

responding to his flight from arrest.  Officers approached him in the gym, and he

sprinted out the rear door, dodged the armed Camacho, and continued to flee.

Nadzom tacked him.  Brice righted himself and continued his flight attempt.

DeHart, Losty, Nadzom, and Shaffer tackled him a second time.  Camacho, without

holstering his firearm, approached, grabbing him at the shoulder.  The side of

Camacho's weapon brushed against Brice's head.  Brice testified that he believed

this contact to be accidental.  Nevertheless, Brice alleges that Camacho deliberately

discharged the weapon only seconds after the accidental brush of the weapon to his

head. Brice testified that he inferred this solely because Camacho failed to holster

the gun before engaging Brice.[12]  He affirmed that he had no other evidence supporting his allegation that Camacho volitionally fired the gun, and his filings in opposition to the motion for summary judgment have produced none.

The court finds that no reasonable jury could conclude that Camacho acted with volition based on Brice's evidence.   Brice's inference of Camacho's intentional conduct becomes strained in light of his avowed flight attempt and his admission that the contact between the weapon and his head seemed accidental.  Its tenuousness only increases after considering Brice's further admission that merely "seconds," (Doc. 67, Ex. E at 60), passed between when Camacho initially grabbed hold of him and when the gun "just went off." (Id.)

Moreover, no corroborating evidence exists to support Brice's inference of intentional conduct.  The record contains no evidence that, for example, Camacho threatened Brice with the gun after Brice exited the gym and ran away from him.

---

[12]At his deposition, Brice testified as follows:

Q.     Page 8 of your proposed amended complaint[—]you allege the Defendant Camacho deliberately and without warning discharged his firearm.  What facts are known to you that support your claim that he deliberately did that?

A.     Well, because he—because he never holstered his gun.  He never holstered his gun.  And [these are] my facts.  He never holstered his gun.  I'm pretty sure he knew he had his gun in his hand, and he still did what he did. . . .

Q.     Is there any other fact known to you that support your claim that that was done deliberately as opposed to accidently?

A.     Well, no.

(Doc. 67, Ex. E at 184 (paragraph formatting altered from original).)

18

Camacho never brandished the weapon at Brice when Camacho aided the other officers wrestling him to the ground, nor did Camacho menacingly jab Brice with it as he exerted force on Brice's collar.  The court concludes that, after evaluating the evidence *in toto*, even the most credulous of reasonable jurors would be unable to believe that Camacho acted volitionally.[13]

A plaintiff cannot maintain an excessive force against a defendant based upon the defendant's non-volitional acts.  Therefore, Brice cannot maintain an excessive force claim against Camacho for the firing of the weapon, and the motion

---

[13]The court's opinion should not be construed as an endorsement of Camacho's conduct.  To the contrary, Camacho's actions placed Brice, passersby and Camacho's fellow officers at a risk of fatal harm.  Nevertheless, the court believes that cases such as <u>Brower</u>, <u>Troublefield</u>, <u>Dodd</u>, and others, <u>see</u> <u>supra</u> note 11 and accompanying text, counsel that a police officer's discharge of a firearm must be volitional to subject the officer to a Fourth Amendment claim.  The court recognizes that application of this standard may leave Brice without an effective remedy to vindicate his alleged wrongs; however, it is equally convinced that excessive force doctrine as presently developed dictates such a result.  The court wishes to reiterate its observation in <u>Troublefield</u>, which stated:

> In . . . ruling [that no excessive force claim arises from the accidental discharge of a police weapon], the court notes that, in circumstances like those in the present [case], § 1983 jurisprudence at times dictates harsh results.  However, it is clear that not every injury born by a citizen at the hands of the government rises to the level of a constitutional violation.  Such is the case here.  The court will dismiss plaintiff's fourth amendment excessive force claim.

<u>Troublefield</u>, 789 F. Supp. at 166.

for summary judgment will be granted.[14]  Brice may continue to maintain his excessive force claim against Camacho insofar as it relies on Camacho's volitional conduct during the course of the arrest, including Camacho's volitional failure to reholster his weapon while struggling with Brice.[15]

## 2.  State-Created Danger Claim against All Individual Defendants

The Fourteenth Amendment's Due Process Clause limits the state's power to act but does not place an affirmative obligation upon the state to act; it does not guarantee "certain minimal levels of safety and security." DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 195 (1989).  The Due Process Clause "confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." Id. at 196.

"Although the general rule is that the state has no affirmative obligation to protect its citizens from the violent acts of private individuals, courts have

---

[14]Having concluded that Brice suffered no constitutional injury arising from the accidental discharge of the firearm, his municipal liability claim likewise fails because there is no constitutional harm upon which to predicate recovery. See Brown v. Commonwealth of Pennsylvania, 318 F.3d 473, 482 (3d Cir. 2003) ("[F]or there to be municipal liability, there . . . must be a violation of the plaintiff's constitutional rights.").  Summary judgment will be granted in favor of the city to extent that his municipal liability claim finds its basis in Camacho's accidental shooting.

[15]The court notes that the defendants have not moved for summary judgment on the excessive force claim to the extent that it arises for any of the officers' intentional conduct.

recognized [certain] exceptions to this rule." <u>Morse v. Lower Merion Sch. Dist.</u>, 132

F.3d 902, 907 (3d Cir. 1997).  One exception is the state-created danger theory.  <u>Id.</u>

Courts have interpreted <u>DeShaney</u> as creating a substantive due process obligation

only in circumstances where the state affirmatively creates a danger or increases a

victim's vulnerability to harm.  <u>See</u> <u>DeShaney</u>, 489 U.S. at 201 ("While the State

may have been aware of the dangers that [the victim] faced in the free world, it

played no part in their creation, nor did it do anything to render him any more

vulnerable to them.").  In <u>Kneipp v. Tedder</u>, 95 F.3d 1199 (3d Cir. 1996), the United

States Court of Appeals for the Third Circuit adopted the state-created danger

theory "as a viable mechanism for establishing a constitutional violation under 42

U.S.C. § 1983."  95 F.3d at 1201.  In order to establish a state-created danger claim,

plaintiffs must allege the following essential elements:

> (1)   the harm ultimately caused was foreseeable and fairly direct;
> (2)   a state actor acted with a degree of culpability that shocks the conscience;
> (3)   a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
> (4)   a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

<u>Bright v. Westmoreland County</u>, 443 F.3d 276, 281 (3d Cir. 2006) (internal quotations

and footnotes omitted); <u>see also</u> <u>Sanford v. Stiles</u>, 456 F.3d 298, 304-05 (3d Cir. 2006).

The state-created danger claim cannot be predicated upon the force used to

arrest the plaintiff.  "*[A]ll* claims that law enforcement officers have used excessive

force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." Graham v. Connor, 490 U.S. 386, 395 (1989); see also United States v. Lanier, 520 U.S. 259, 272 n.7 (1997) ("Graham simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."); Rivas v. City of Passaic, 365 F.3d 181, 198 (3d Cir. 2004).  The Fourth Amendment reasonableness standard provides police with a practical analysis that officers can apply in tense situations requiring decisive action.  See Wheeler v. City of Phila., 367 F. Supp. 2d 737, 746-47 (E.D. Pa. 2005) ("Unlike many legal tests, the Fourth Amendment reasonableness inquiry is straightforward and officers can readily apply it."). Requiring police to adhere to a more stringent standard would cause use-of-force decision-making—and the public safety safeguarded by officers—to suffer.  See id. The "elusive" conscious-shocking standard of the state-created danger doctrine is particularly ill-suited to split-second police conduct.  Id.  (quoting Estate of Smith v. Marasco, 318 F.3d 497, 509 (3d Cir. 2003)).  Therefore, a plaintiff seeking recovery for police conduct during the course of an arrest must predicate recovery upon the Fourth Amendment.

In the case *sub judice*, Brice's state-created danger allegations proceed entirely from the force used to effectuate his arrest.[16]  His summary judgment filings confirm that both the excessive force claim and the state-created danger claim rely on the same police conduct.  Only an excessive force claim can rest upon police conduct during an arrest;[17] a state-created danger claim may not.  Hence, summary

---

[16]Brice apparently confirmed the common factual bases of the two claims during his deposition.  The parties have not attached the relevant excerpts to their summary judgment filings, but they agree that he testified to that effect.  (See Doc. 65 ¶ 64; Doc. 74 ¶ 64.)

[17]Brice contends that this holding is inconsistent with the accidental discharge of Camacho's weapon. He argues that the non-volitional gunshot was insufficient to effectuate a seizure of him, rendering the shooting outside the Fourth Amendment's scope and therefore subject to the Fourteenth Amendment.  Brice's contention is without merit.  The Fourth Amendment applies to any conduct that occurs during "the course of an arrest."  Graham, 490 U.S. at 395.  The shooting was unintentional but nevertheless occurred while the officers were attempting to arrest Brice.  Accordingly, the Fourth Amendment provides the appropriate doctrine under which to analyze Brice's claim regardless of whether it permits any avenue for recovery.

Even were the court to assume, *arguendo*, that the state-created danger doctrine applied, granting summary judgment in favor of the officers would remain the appropriate disposition of the claim.  The state-created danger doctrine requires conscience-shocking conduct by the defendant.  Conduct that is conscience-shocking depends entirely on the individual circumstances of each case.  Estate of Smith, 318 F.3d at 508.  For example, in high-pressure situations calling for quick police decision-making, intent to harm may be required.  Ye v. United States, 484 F.3d 634, 638 n.2 (3d Cir. 2007).  Conduct undertaken with "deliberate indifference" or "reckless disregard" will fail to qualify as conscience-shocking under these circumstances.  See County of Sacramento v. Lewis, 523 U.S. 833, 846-53 (1998); Estate of Smith, 318 F.3d at 507 ("'[D]eliberate indifference' or 'reckless disregard' alone [will] not lead to liability for violating substantive due process rights in a pursuit case.").  A high-speed police chase is an example of such a situation.  See Ye, 484 F.3d at 638 n.2.  In contrast, deliberate indifference may be conscience-shocking in a situation that permits the decision-maker to analyze various options and examine the consequences of each.  Id.  Regardless of the nature of the situation, "liability for negligently inflicted harm is categorically

judgment will be granted in favor of the individual officers on the state-created

danger claim.[18, 19]

_____

beneath the threshold of constitutional due process" in all cases. <u>Lewis</u>, 523 U.S. at 849.

In the instant case, reasonable jurors would agree that the officers' conduct does not shock the conscience. Brice was fleeing arrest. Police tackled him on two separate occasions. A total of five police officers were involved in this task. These facts do not present a situation in which police could calmly reflect on various options before apprehending Brice. Rather, they present an exigent need to apprehend a known flight risk with a history of violent resistence. Camacho and the other officers were required to respond quickly as Brice resisted arrest. Camacho accidentally discharged his weapon as this intense situation unfolded. Assuming that Brice could properly maintain a state-created danger claim, granting summary judgment in favor of defendants would remain the proper disposition for the claim.

[18]In light of the court's finding that Brice suffered no deprivation of his Fourteenth Amendment right to be free of state-created danger, the court will also enter summary judgment in favor of the city on the state-created danger claim. <u>See</u> <u>Brown</u>, 318 F.3d at 482.

[19]The individual defendants seek entry of judgment on Brice's excessive force and state-created danger claims against them in their official capacity. (Doc. 64 at 5-6.) Brice fails to offer any argument in response, stating that "such issue is more appropriately resolved at trial." (Doc. 73 at 32 n.23.) Brice has provided no legal support for his refusal to address the issue raised by defendants. Accordingly, the court concludes that he has abandoned this claim. <u>See</u> <u>D'Angio v. Borough of Nescopeck</u>, 34 F. Supp. 2d 256, 265 (M.D. Pa. 1999) (noting that abandonment of a position is tantamount to waiver); <u>see also</u> L.R. 7.6. Summary judgment will be granted with respect to the official capacity claims against the individual defendants.

The court notes that claims against state officials in their official capacities merge as a matter of law with the municipality that employs them. <u>See</u> <u>Kentucky v. Graham</u>, 473 U.S. 159, 165 (1985) (quoting <u>Monell v. Dep't of Soc. Svcs.</u>, 436 U.S. 658, 690 n.55 (1978)); <u>Gregory v. Chehi</u>, 843 F.2d 111, 120 (3d Cir. 1988) (asserting that official-capacity claims are the equivalent of claims asserted directly against the government); <u>Crane v. Cumberland County</u>, No. 1:CV-99-1798, 2000 WL 34567277, at *3 (M.D. Pa. June 16, 2000) ("[W]hen a plaintiff names the municipality as a defendant, it is redundant, and possibly confusing to the jury, to also include the employee in his or her official capacity, because the two are really one

B.     **The Municipal Liability Claim for Excessive Force**[20]

Municipalities and other local government entities may not be held liable

under § 1983 for the acts of their employees under a theory of *respondeat superior* or

vicarious liability. Bd. of County Comm'rs v. Brown, 520 U.S. 397, 403 (1997); see also

Colburn v. Upper Darby Twp., 946 F.2d 1017, 1027 (3d Cir. 1991).  However, a

municipality may be held liable if the plaintiff can "identify a municipal 'policy' or

'custom' that caused the plaintiff's injury." Id. (citing Monell v. Dep't of Soc. Servs.,

436 U.S. 658, 694 (1978)).

A policy is an official proclamation or edict of a municipality, while a custom

is a practice that is "so permanent and well settled as to virtually constitute law."

Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) (quoting Andrews v. City of

Phila., 895 F.2d 1469, 1480 (3d Cir. 1990) (citations omitted).  "A custom is an act 'that

has not been formally approved by an appropriate decisionmaker,' but that is 'so

widespread as to have the force of law."  Natale v. Camden County Corr. Facility, 318

F.3d 575, 584 (3d Cir. 2003) (quoting Brown, 520 U.S. at 404).  The policy or custom

upon which the plaintiff bases a claim must emanate from an individual with the

authority to promulgate municipal standards in the relevant area.  See LaVerdure v.

_____

defendant.").  In light of the court's grants of summary judgment in favor of
defendant City of York, see infra Part III.B, summary judgment is likewise an
appropriate disposition of the official capacity claims regardless of Brice's waiver.

[20]Plaintiff's claim alleging municipal liability is otherwise known as a Monell
claim because the doctrine was established by the Supreme Court's decision in
Monell v. Department of Social Services, 436 U.S. 658 (1978).

County of Montgomery, 324 F.3d 123, 126 (3d Cir 2003) ("To be a policymaker for §

1983 purposes, an official must have *final* policymaking authority.").  A plaintiff must

produce evidence either that the policymaker's action violated the plaintiff's rights

or that the policymaker failed to act when presented with an obvious need for action,

rendering the municipality "deliberately indifferent to the need." Natale, 318 F.3d

575 at 584 (quoting Brown, 520 U.S. at 471-18).

Municipal liability also requires the plaintiff to demonstrate that "'there is a

direct causal link between [the] municipal policy or custom and the alleged

constitutional deprivation.'" Brown v. Muhlenberg Twp., 269 F.3d 205, 214 (3d Cir.

2001) (quoting City of Canton v. Harris, 489 U.S. 378, 385 (1989)).  The link between

the policy or custom and the injury may not be attenuated or suppositional.  The

plaintiff must demonstrate that the policymaker's actions "directly caused

constitutional harm." Gottlieb ex rel. Calabria v. Laurel Highlands Sch. Dist., 272

F.3d 168, 175 (3d Cir. 2001) (quoting Stoneking v. Bradford Area Sch. Dist., 882 F.2d

720, 725 (3d Cir. 1989.)); see also Woloszyn v. County of Lawrence, 396 F.3d 314, 325

(3d Cir. 2005) (quoting Colburn, 946 F.2d at 1028) ("'[T]he identified deficiency in

[the alleged policy or custom] must be closely related to the ultimate [constitutional]

injury.'" (final alteration in original)).  Proximate cause requires an "affirmative link"

between the policy or custom and the alleged injury. Kneipp, 95 F.3d at 1213.

Brice alleges that the policies and customs of the York City Police

Department resulted in the individual defendants' use of excessive force to arrest

26

him.  Brice advances two grounds for municipal liability.[21]  First, he contends that

the police department maintained a custom of inadequately investigating citizen

complaints of excessive force.  He argues that had it more thoroughly investigated

complaints it would have discovered a pattern of unconstitutional conduct by its

officers.  It could have then remedied this problem, thereby preventing his

constitutional injury.  Second, he alleges that the department failed to adequately

train and supervise the officers who arrested him and that, had it done so, his injury

would not have occurred.  The court will address these issues *seriatim*.

### 1.     Failure to Investigate Citizen Complaints

A custom of failing to investigate citizen complaints may provide a basis for

municipal liability if the "a policy-maker (1) had notice that a constitutional violation

was likely to occur, and (2) acted with deliberate indifference to the risk."

Hernandez v. Borough of Palisades Park Police Dep't, 58 F. App'x 979, 912 (3d Cir.

2003.); Beck v. City of Pittsburgh, 89 F.3d 966, 973 (3d. Cir. 1996); Maiale v. Youse,

No. Civ. A. 03-5450, 2004 WL 1925004, at *8 (E.D. Pa. Aug. 27, 2004) (holding that

police department's failure to discipline an officer can create municipal liability,

particularly when plaintiff's injuries result from conduct similar to that alleged in

---

[21]In light of the court's findings that the accidental shooting did not violate
Brice's Fourth Amendment rights and that none of the defendants violated his right
against state-created danger, Brice cannot maintain municipal liability claims on
the grounds.  See Brown, 318 F.3d at 482; see also Sanford v. Stiles, 456 F.3d 298,
314 (3d Cir. 2006) (stating that municipal liability requires an underlying violation of
constitutional rights, either by the municipality's employees or as a result of its
policies and customs).  His municipal liability claim is therefore limited to the city's
alleged liability for the intentional actions of the officers arresting him.

prior complaints against the officer).  The plaintiff must also prove that the failure to investigate proximately caused the plaintiff's injuries.  See Watson v. Abington Twp, 478 F.3d 144, 156 (3d Cir. 2007); Beck, 89 F.3d at 972 n.6.

Beck v. City of Pittsburgh, 89 F.3d 966 (3d Cir. 1996) is the seminal case in the area of failure to investigate citizen complaints.  In Beck, the Third Circuit reversed the district court's grant of judgment as a matter of law in favor of the City of Pittsburgh.  The case arose from a police officer's use of excessive force to arrest the plaintiff, who alleged that the officer drew his gun, pushed it into the plaintiff's face, and struck the plaintiff with it at least six times during the course of the arrest.  See id. at 968.  Four excessive force complaints had been filed against this officer during the three-year period prior to the plaintiff's arrest.  See id. at 969.  The officer had received a total of six citizen complaints, including the plaintiff's, by the time of trial. See id. at 969-70.  The complaints evidenced a pattern of abusive behavior by the individual officer.  One complaint stated that the officer hit the complainant's face with a billy club after the complainant was placed under arrest.  See id. at 970. Another accused the officer of  "push[ing the] face [of a complainant] hard against the police vehicle" without any apparent reason for doing so.  Id. at 969.  Internal investigations of these complaints unanimously resulted in no discipline against the officer despite findings that the allegations of at least one of the complainants were "believable."  Id.

The complaint procedure in Beck failed to apprise city policymakers of the officer's pattern of violent conduct because internal investigations handled each

complaint as an isolated occurrence.  Id. at 973.  Complaints were never compared

against one another to reveal patterns of problematic conduct.  Id. Additionally,

internal investigators discounted testimony of complainants and others associated

with them, giving substantial weight only to the testimony of impartial observers,

who were rarely present.  Id.  These and other systemic problems rendered the

citizen complaint process "sterile and shallow," incapable of either alerting

policymakers to patterns of unconstitutional conduct or remedying constitutional

violations once they occurred.  Id. at 973-74.[22]

In the present case, Brice contends that the city inadequately responded to a

series of complaints involving allegations of excessive force during the four years

preceding his arrest.  He contends that a more thorough policy would have alerted

the department to a pattern of excessive force that, if addressed, would have

prevented his alleged constitutional injuries.  Brice has produced nine complaints[23]

---

[22]In Beck, the Third Circuit addressed only whether a reasonable jury could
have found that the city's failure to implement meaningful complaint reporting
systems constituted deliberate indifference to the risk of constitutional violations.
See 89 F.3d at 973.  The court did not consider whether the plaintiff had produced
sufficient evidence to support the causation element of recovery.  See id. at 972 n.6.

[23]These complaints are catalogued as Exhibit H in opposition to the motion
for summary judgment.  To facilitate citation to the exhibit, the court has
consecutively numbered its pages 1 through 35 beginning with the first page of
complaint form No. 920.

of excessive force against police officers during the four years prior to his arrest.[24]

(See Doc. 75, Ex. H.)  DeHart, Losty, and Shaffer are each the subject of one

complaint.  (Id. at 24, 30, 33.)  Camacho and Nadzom do not appear in any of the

complaints.  The complaint involving DeHart makes no excessive force allegation

against DeHart, instead implicating another officer unrelated to the present case.

The remaining forms collectively lodge no more than one allegation of potentially

excessive force against each of the officers named therein.  (See generally id.

passim.)  Two of the nine complaints are based on officers' use of force to apprehend

fleeing suspects.  (See Doc. 75, Ex. H at 2, 31.)

Contrary to Brice's assertions, the complaints do not present a pervasive

pattern of constitutional violations by York City police officers.  In Beck, citizens

filed six complaints against a single police officer over a four-year period.  See Beck,

89 F.3d 966 at 969-70.  In contrast, the entire York City police force of ninety-nine

officers, (see Doc. 65 ¶ 1; Doc. 74 ¶ 1), has collectively garnered only nine complaints

during approximately the same amount of time.  These complaints collectively

contain no more than one allegation of unconstitutional conduct against any single

---

[24]Plaintiff has produced eleven separate complaints.  However, complaint forms Nos. 1123 and 1125 have been completed by the same complainant and concern the same incident.  (See Doc. 75, Ex. H at 3-13.)  These two forms therefore constitute a single complaint.  Complaint form No. 927 alleges that defendant Shaffer used profanity against the complainant.  (See id. at 22.)  The complainant does not aver any use of physical force.  (See id.)  The complaint does not allege conduct implicating constitutional injury, and the court will not consider it further.  See Todd v. Kyler, No. 1:CV-05-1994, 2007 WL 61062, at *4 (M.D. Pa. Jan. 5, 2007) ("Mere threatening language and gestures of a[n] . . . officer do not, even if true, amount to constitutional violations.").

police officer.  Of the officers involved in Brice's arrest, only DeHart, Losty, and

Shaffer were subjects of these complaints, and the complaint against DeHart does

not allege that he used any force against the complainant.  Camacho and Nadzom

are not identified in any of the complaints.  In fact, the only evidence of past

improper conduct by Camacho is a minor traffic accident that occurred more than

five years before Brice's arrest.  (See Doc. 75, Ex. M.)[25]

Further, Brice's evidence about the citizen investigation process does not

depict a complaint review procedure that provides only "sterile and shallow . . .

investigation," as was the case in Beck.  89 F.3d at 973.  Whereas the internal

reporting system in Beck failed to perform anything more than a cursory

investigation of citizen complaints, York City Police Captain David Arnold

("Arnold")[26] testified that the police inspector attempts to contact every citizen

complainant to conduct an interview, usually via telephone.  (Id. at 60.)  A

---

[25]The incident arose when Camacho turned too sharply into a parking lot and struck a turnstile pole.  (See Doc. 75, Ex. M.)

[26]Brice relies on the testimony of Follmer and Captain David Arnold to describe alleged inadequacies of the city's citizen complaint review procedure.  Follmer was promoted to the Inspectional Services Division only two weeks before Brice's arrest and did not participate in the investigation of the citizen complaints before then.  (Compare Doc. 75, Ex. E at 5-6 (noting that Follmer became inspector of Internal Affairs on January 3, 2002); with Doc. 75, Ex. B at 12-13 (indicating that Brice was arrested on January 16, 2002).  He also produced testimony of David Arnold, who has served as a York City Police Captain since 2003.  (Doc. 67, Ex. C at 5.)  Arnold does not participate in internal affairs investigations, but is familiar with them.  (Doc. 75, Ex. G at 58-60.)  Follmer and Arnold's testimony indicates that they are familiar with the police department's practices investigating citizen complaints even though they did not participate in the investigations of the complaints used by Brice to assert his municipal liability claim.

31

complainant who cannot be reached via telephone is sent a letter by registered mail that requests contact information.  (Id.)  If the complainant does not respond, the inspector has discretion either to proceed with the investigation or to close it based on the information available in a particular complaint.  (Id.)

Inspector Follmer's handling of the citizen complaint filed by Brice after his arrest verifies Arnold's description of the complaint process.  Follmer required all individual defendants in the present case to file written descriptions of the arrest on two separate occasions.  (Doc. 65 ¶¶ 37, 44; Doc. 74 ¶¶ 37, 44.)  He obtained an additional recorded statement from Camacho, and he met with Brice in prison twice to document his allegations.  (Doc. 65 ¶¶ 38, 40, 43; Doc. 74 ¶¶ 38, 40, 43.)  Follmer attempted to contact one of the two witnesses Brice listed on the complaint form but was unable to do so.  (Doc. 65 ¶ 47; Doc. 74 ¶ 47.)  He did not contact the other witness because she was not present behind the gym when the officers arrested Brice.  (Doc. 65 ¶ 47; Doc. 74 ¶ 47.)  Camacho was not disciplined for his actions during Brice's arrest,[27] (see Doc. 75, Ex. B at 72), but Follmer testified that, in his experience, internal investigations have resulted in disciplinary action of York City

---

[27]Camacho was not disciplined because the shooting was ruled accidental after completion of an investigation by the Inspectional Services Division.  (Doc. 75, Ex. B, at 72).  The record contains no indication that the other individual defendants were disciplined for their roles in Brice's arrest.

police officers on several occasions during his tenure.[28]  (Doc. 75, Ex. E, at 69.)

Disciplinary actions against an officer are tracked in the officer's permanent

personnel files.[29]

These complaint review procedures do not create a "sterile and shallow"

system of investigation in which "each complaint was insulated from other prior and

similar complaints and treated in a vacuum." Beck, 89 F.3d at 973.  To the contrary,

testimony regarding the complaint review procedures in the instant case

demonstrate that the police department thoroughly investigates allegations of

---

[28]Follmer could not supply a precise number of officers whom had been disciplined, but he estimated the number to be fewer than ten during the two-and-one-half years between Brice's arrest and his deposition in the instant matter. (Doc. 75, Ex. E at 69.)

[29]Brice argues that none of the complaint forms filed during the years before his arrest indicate that they were investigated or resolved as required under the citizen complaint policy.  Each complaint form includes a detachable receipt upon which intake officers are to document the disposition of the complaint. (See Doc. 75, Ex. H at 1.)  If the intake officer is unable to rectify the complaint, the receipt is to be given to the complainant and identifies additional steps that will be undertaken to investigate it. (Id.)  None of the receipts on the nine complaints has been appropriately completed, and Brice contends that this confirms the inadequate investigation of citizen complaints.

The court does not agree.  A review of the complaint form filed by Brice reveals that the receipt is not appropriately completed (see Doc. 75, Ex. U), but Follmer nevertheless performed a rigorous investigation into Brice's arrest.  Seven of the nine complaints prior to Brice's arrest contain indicia that they were investigated or forwarded to supervisors for further review.  (See Doc. 75, Ex. H at 1, 14, 16, 18, 26-27, 30, 32.)  Brice testified that he knows of no occasion upon which the York City Police Department refused to investigate an excessive force complaint or found one to be valid and refused to take action. (Doc. 67, Ex. E at 176-177.)  The court finds that, were reasonable jurors to review this evidence, they would be unpersuaded by Brice's argument that the failure to account for every jot and tittle on the complaint forms translates into deliberate indifference to the constitutional rights of citizens.

excessive force and administers discipline when those allegations are substantiated. They are distinguishable from <u>Beck</u>, in which the complaint procedures provided no meaningful recourse against officers who violated individuals' constitutional rights. The court therefore concludes that no reasonable juror could find that these complaint review procedures were deliberately indifferent to the constitutional rights of the citizens of the City of York.

Brice has produced a sundry of other alleged defects in the York City Police Department's investigation policies, including the unexplained absence of several hundred complaint forms, the failure of the Inspectional Services Division to keep a discipline log independent of the records in officer's personnel files, and the failure of supervisors to address the intricacies of the seven-page citizen complaint policy with Follmer upon his promotion to the position of Inspector of Internal Affairs. The police department also neglected to document the discharge of Camacho's weapon after Brice's arrest. Such evidence may demonstrate that the York City Police Department failed to adhere to the letter of its policies, but it simply does not rise to the level of deliberate indifference necessary for a violation of Fourth Amendment rights.

Additionally, Brice has failed to establish a "direct causal" link between these shortcomings and his constitutional injury. <u>Brown v. Muhlenberg Twp.</u>, 269 F.3d at 214. The alleged defects in the city's investigation of citizen complaints and enforcement of policies are not "closely related to the ultimate [constitutional] injury" alleged by Brice. <u>Woloszyn</u>, 396 F.3d at 325. The police officers in the

34

present case were attempting to apprehend Brice, a known fight risk and a suspect

who had a history of fighting police officers.  Brice fled the officers' initial attempts

to arrest him and was brought to the ground by Nadzom.  He then broke free of

Nadzom's tackle, continued to flee, and was again wrestled to the ground by

Camacho, DeHart, Losty, Nadzom, and Shaffer.  The eventual discharge of

Camacho's gun was an accidental result of the struggle between Brice and the

officers.

The court finds that no reasonable jury would conclude that the alleged

inadequate investigation of complaints and other policy shortfalls were "closely

related" to or directly caused Brice's alleged injury.  Woloszyn, 396 F.3d at 325.  The

events surrounding Brice's arrest would not have changed had the city's

policymakers acted differently.  None of the citizen complaints reveal multiple

allegations of abusive behavior by any of the officers involved in Brice's arrest.

Other evidence of the police department's incomplete compliance with its internal

policies is simply sound and fury.  It does not signify the direct causal link required

for municipal liability under § 1983.[30]   Therefore, Brice cannot hold the City of York

liable for excessive force under a theory of failure to investigate citizen complaints.

---

[30]Brice has introduced the report of an opinion witness that discusses the
various inadequacies of the city's policies regarding investigation of complaints and
training of officers.  (See Doc. 75, Ex. I.)  The report also opines that these
shortcomings produced Brice's constitutional injury.  Nevertheless, the court
concludes that reasonable jurors would disagree with the report's assertion that the
city's policies and customs demonstrate deliberate indifference to Brice's
constitutional rights or that they proximately caused his alleged injuries.

35

### 2.  **Failure to Train**

A local government entity may also be held liable for constitutional violations that result from its failure to train or supervise its employees.  The failure must "amount[] to deliberate indifference to the constitutional rights of persons with whom the police come in contact."  Colburn, 946 F.2d at 1028 (citing City of Canton v. Harris, 489 U.S. 378, 388 (1989)).  In the context of officer training, deliberate indifference requires that "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights."  Carter v. City of Phila., 181 F.3d at 339, 357 (3d Cir. 1999).  Recovery requires that the failure to train be "closely related to the ultimate [constitutional] injury."  Woloszyn, 396 F.3d at 325.

In the case *sub judice*, Brice alleges that the police department inadequately trained its employees because it failed to implement a behavior monitoring system to detect developing problems with officers' personal and professional conduct.  He invokes the city's alleged incomplete investigation of citizen complaints to suggest that the department neglected to review use-of-force polices with officers after the filing of citizen complaints.[31]  Finally, he contends that the mayor and city council are notified of officer misconduct only if it potentially warrants termination of

---

[31]Brice also alleges that the police department's failure to discipline Camacho because of the weapon discharge constituted a failure to train.  Having found that the gunshot did not violate Brice's constitutional rights, the court declines to consider this position further.  See Brown, 318 F.3d at 482.

employment.  He suggests that these city policymakers therefore remain deliberately ignorant of police misconduct and deliberately indifferent to the need to train officers about police conduct guidelines.

The court finds that these allegations fail to support liability under a failure-to-train theory because they are not causally related to Brice's constitutional injury. Brice has alleged that the city failed to implement a behavior monitoring system, but he has not adduced evidence that the officers arresting him repeatedly engaged in conduct that would have alerted city officials to the risk that they might use excessive force to apprehend a fleeing suspect.  His allegations regarding investigation of citizen complaints are similarly unavailing because the city's investigative processes were not sufficiently inadequate to constitute deliberate indifference.  See supra, Part III.B.1.  More zealous investigation of citizen complaints would not have altered the intentional actions of the officers in this case, who were faced with the immediate need to apprehend a dangerous suspect known to engage in violent conduct to avoid arrest.

The police department's disciplinary structure likewise undermines Brice's failure-to-train allegations.  Officers are disciplined under the policies promulgated by the police department that establish disciplinary procedures and enumerate rules of conduct.  (Doc. 67, Ex. C at 46-52.)  The chief of police is involved in administering discipline whenever an officer has committed an offense that warrants punishment of at least a one-day suspension.  (See Doc. 75, Ex. G at 49-50 (stating that an entity known as the trial board reviews misconduct and submits disciplinary

recommendations to the chief of police whenever an officer is charged with a third-level offense); Doc. 75, Ex. N § II.C (describing third-level offense as one punishable by suspension of between one and five days)).  The mayor and city council become involved if the officer's conduct could result in termination.  (See Doc. 75, Ex. G at 51-52; Doc. 75, Ex. N § III.G.)  Reasonable jurors could not conclude that correcting any of the alleged administrative shortcomings of the complaint and disciplinary policies would have altered the arrest-related conduct of the defendant officers faced with a potentially volatile situation.

A review of the training that the city required of its police officers reinforces the conclusion that the city adequately trained its officers.  The police department requires all officers to attend four months of training before joining the department, as mandated by state regulations.  Aspiring officers focus on at least sixteen areas of police training, including the handling of firearms.  See 37 PA. CODE § 203.51; (Doc. 65 ¶ 4; Doc. 74 ¶ 4).  Officers must demonstrate proficiency with their police weapon by passing a qualification test that requires at least seventy-five percent of shots fired to accurately hit a target.  See 37 PA. CODE § 203.11; (Doc. 75, Ex. B, at 59-60.) After completing this program, police officers undergo a training on the department's various policies.  (Doc. 75, Ex. B at 44.)  Officers also participate in an initial twelve-week field training program, during which the officers cover various police shifts under supervision.  (Doc. 65 ¶ 6; Doc. 74 ¶ 6.)  All officers must complete mandatory annual in-service requirements and must demonstrate shooting proficiency on an annual basis.  See 37 PA. CODE § 203.52(a) & (b)(1); (Doc. 65 ¶ 7;

38

Doc. 67, Ex. C at 27; Doc. 74 ¶ 7).  Members of specialized police units, including

Camacho, receive additional training and must undergo more extensive firearm

training. (Doc. 75, Ex. B at 59-61.)  The department's training program also permits

officers to pursue bachelor's and graduate degrees with a portion of the costs

reimbursed by the department.  (Doc. 65 ¶ 8; Doc. 74 ¶ 8.)

 The court notes that compliance with mandatory state training requirements

is not sufficient per se for a municipality to satisfy its training obligations.  <u>See

Hogan v. City of Easton</u>, No. Civ. A. 04-0759, 2006 WL 3702637, at *13 (E.D. Pa. Dec.

12, 2006).  However, the court is satisfied that reasonable jurors would agree that the

city adequately trained its officers to execute an arrest warrant under the

circumstances of the present case.  Indeed, executing arrest warrants is one of the

most common of police duties, and the court holds that the city adequately trained

its officers to perform that task.  The city's extensive training program certainly does

not evidence a deliberate indifference to a risk that its employees could inflict

constitutional harm on individuals in Brice's situation.[32]   Accordingly, Brice cannot

rest his municipal liability claim upon a failure-to-train theory.

---

[32]Brice analogizes <u>Jarlett v. Callis</u>, No. Civ. A. 00-3489, 2001 WL 849709 (E.D. Pa. 2001), to the present case to support liability based upon the city's alleged inadequate investigation of citizen complaints and training of officers.  In <u>Jarlett</u>, officers of the Philadelphia Housing Authority ("PHA") stopped the plaintiff's vehicle for failing to comply with a stop sign.  <u>Id.</u> at *1.  The officers discovered contraband, but charges were later dropped because the traffic violation occurred outside the jurisdiction of PHA.  <u>Id.</u>  Approximately two weeks after the initial stop and before charges had been dropped, the same officers again stopped the plaintiff for running a stop sign only one block from the site of the first violation.  <u>Id.</u> at *1-*2.  No charges were filed against plaintiff after the second stop.  <u>Id.</u> at *2.

The plaintiff filed a municipal liability claim against PHA predicated upon, *inter alia*, its failure to adequately investigate prior complaints of improper traffic stops and failure to train its officers about jurisdictional limitations.  <u>Id.</u> at *3.  The Eastern District denied PHA's motion for summary judgment under both theories.  Plaintiff supported the failure to investigate theory using evidence that PHA maintained no statistics on improper traffic stops by its officers.  <u>Id.</u> at *8.  It did not catalogue complaints, and thus was unable to determine how many complaints had been filed alleging similar violations by officers.  <u>Id.</u>  Proper jurisdictional limits were never reviewed with the officers who stopped plaintiff's vehicle, nor were notations of misconduct placed in their personnel files.  <u>Id.</u>

Evidence supporting liability under the failure-to-train theory included the officers' testimony that they had never been instructed about jurisdictional limits and learned jurisdictional parameters by reviewing PHA directives.  <u>Id.</u> at *7.  The PHA maintained no cumulative record of officers' failure to adhere to jurisdictional limits, and its supervisors believed that non-jurisdictional stops would inevitably "happen."  <u>Id.</u>  PHA never attempted to remedy its officers' inadequate understanding of jurisdictional limits, and the plaintiff had therefore produced evidence that the failings of PHA's policies and administration had directly caused his constitutional harm.  <u>Id.</u>

<u>Jarlett</u> is not factually similar.  In the matter *sub judice*, the York City Police Department has been proactive in the investigation of complaints and supervision of officers.  The police department has also satisfied its obligation to train its officers.  Further, the <u>Jarlett</u> plaintiff demonstrated that adequate jurisdictional training and complaint investigation proximately caused the PHA officers to stop his vehicle outside their jurisdiction.  In the present case Brice has failed to demonstrate that the city's alleged policy failings would have prevented the individual officers from using allegedly excessive force to arrest him.  <u>Jarlett</u>, therefore, lends no assistance to plaintiff's cause.

**IV.**   <u>**Conclusion**</u>

Camacho did not violate Brice's Fourth Amendment rights by accidently discharging his weapon, and none of the defendants infringed his right against state-created danger under the Fourteenth Amendment.  To the extent that the intentional actions of the officers may have infringed Brice's Fourth Amendment right to be free from excessive force, Brice has produced no policy or custom of the City of York that proximately caused his injury.  The defendants' motion for partial summary judgment will therefore be granted.

An appropriate order will issue.


Dated: December 28, 2007


   S/ Christopher C. Conner    
CHRISTOPHER C. CONNER
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KEON BRICE,** | : | **CIVIL ACTION NO. 1:03-CV-1979** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF YORK, OFFICER** | : | |
| **CAMACHO, OFFICER SCOTT** | : | |
| **NADZOM, OFFICER SHAFFER,** | : | |
| **OFFICER LOSTY, and OFFICER** | : | |
| **DEHART** | : | |
| | : | |
| **Defendants** | : | |

## ORDER

AND NOW, this 28th day of December, 2007, upon consideration of

defendants' motion for partial summary judgment (Doc. 63), and for the reasons set

forth in the accompanying memorandum, it is hereby ORDERED that:

1. Defendants' motion for partial summary judgment (Doc. 63) is GRANTED as follows:

   a. Summary judgment is GRANTED in favor of defendant Officer Camacho in his individual capacity on plaintiff's excessive force claim insofar as plaintiff predicates the claim upon the accidental discharge of Camacho's weapon.[1]

   b. Summary judgment is GRANTED in favor of defendants Officer Camacho, Officer Scott Nadzom, Officer Shaffer, Officer Losty, and Officer DeHart in their individual capacities on plaintiff's state-created danger claim.

---

[1]The instant order grants summary judgment on this claim only insofar as it arises from the accidental *discharge* of the weapon.  It does not prevent plaintiff from seeking recovery based upon any volitional act by defendant Officer Camacho, including his volitional act of grasping of the weapon while apprehending plaintiff.

      c.      Summary judgment is GRANTED in favor of defendants Officer Camacho, Officer Scott Nadzom, Officer Shaffer, Officer Losty, and Officer DeHart in their official capacities on plaintiff's excessive force and state-created danger claims.

      d.      Summary judgment is GRANTED in favor of defendant City of York on plaintiff's claim of municipal liability for excessive force and state-created danger.

2.      The Clerk of Court is directed to defer entry of judgment until the conclusion of this case.

3.      A revised pretrial and trial schedule shall issue by future order of court.


                                __S/ Christopher C. Conner__
                                CHRISTOPHER C. CONNER
                                United States District Judge